UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

James Joseph Hess and                      Case No:     10-68235
Diane Marie Hess,                            Ch. 7
                                                    Hon. Walter Shapero

    Debtors.
_____/

Opinion Granting in Part
Motion for Relief from the Automatic Stay to Allow Exercise of Setoff Rights

This matter is before the Court on Creditor, Extra Credit Union's Motion for Relief from the Automatic Stay to Allow Setoff under 11 U.S.C. § 553(a) (Docket No. 12).

Background

On September 10, 2010, James and Diane Hess sought relief under Chapter 7 of the Bankruptcy Code. At the time of filing, the Debtors were indebted to Extra Credit Union ("Creditor") in the amount of $19,764.45 due to advances taken on a Visa credit card account. Creditor sought relief from the automatic stay to allow it to exercise its setoff rights under Michigan law. In its motion, Creditor alleged that debtor, James Hess ("Debtor"), and his mother, Mary Hess, had funds in excess of $15,383.79 on deposit in a multiple party account ending in xxxx2460 (the "Account"). Creditor further alleged that it possessed a lien against the funds in the Account based on the terms of a member account agreement as well as a statutory lien under Mich. Comp. Laws § 490.361(4). Creditor further alleged that it was entitled to exercise its setoff rights to the funds in the Account pursuant to Mich. Comp. Laws § 490.64. Creditor moved for relief from the automatic stay to allow it to setoff the balance of the funds on deposit in the Account against the outstanding balance due and owing on the Visa account. Debtor opposed the Creditor's motion asserting that he did not have any interest in the Account. The Court held an evidentiary hearing and this is the Court's decision.

Facts

During the evidentiary hearing, Creditor did not introduce any documentary evidence nor call any witnesses. The Debtor (the sole witness) testified and two exhibits were admitted into evidence. The first exhibit, Exhibit A, is a copy of an April 25, 2005, agreement between the Creditor and the Debtor, his sister, Gail Hess, and his mother, Mary Hess (the "Application"). On the Application, six boxes are listed and only the following three boxes are marked with an "X": Telecheck guarantee; Add or Change Joint or Beneficiary; and Name Change. In the "ACCT#" section of the Application, the numbers 10124-6-0 are listed. Typed in the section denoted as "Primary Member" of the Application, is Mary F. Hess's name, address, her date of birth, and her social security number. Handwritten in the "Primary Member" section is Mary Hess's email address and her mother's maiden name. In the next section of the Application entitled "Taxpayer Identification Number Certification," Mary Hess's signature appears over a certification under penalties of perjury, of the correctness of her taxpayer identification number, that she is not subject to backup withholding, and that she is a "U.S. person." In the third section of the Application entitled "Multiple Name Share Deposit Account with Survivorship," pertinent details are listed for the Debtor's sister, Gail Hess, in a multi-column box denoted as "Name (2)," and for the Debtor in a separate multi-column box denoted as "Name (3)." Handwritten details about the Debtor and his sister including their contact information, dates of birth, mother's maiden name, driver's license numbers, and their social security numbers appear in their respective designated boxes. Along with these details, are both of their signatures. Immediately following the Debtor's signature is a paragraph in very small print that states:

> The joint owners of the account hereby agree with each other and with the credit union that all sums now paid into this account by any or all of said joint owners with all accumulations thereon, are and shall be owned by them jointly with right of survivorship and shall be subject to withdrawal or receipt of any of them, except to the extent an initialed restriction below applies. Payment in accordance with such a proper demand shall be valid and discharge the credit union from any liability for such payment. The credit union is hereby authorized to recognize the signatures subscribed on this form, in accordance with the restrictions initialed below, in the payment of funds or the transaction of any business for this account. However, no individual may be removed as an owner of this account, except upon death, without that individual's consent. No beneficiary of this account may be changed except with the consent of all living members. The right or authority of

the credit union under this agreement may not be changed by any member, except by written notice to the credit union. Such notice shall not affect any transactions made prior to receipt of the notice of the credit union.

The "Withdrawal Restrictions" section of the Application allows the primary member to check off three possible boxes with specific restrictions stated next to each box and a space is provided to allow a primary member to insert her initials. Likewise, space is provided to permit a joint owner to insert his/her initials to indicate approval of the restriction. None of the boxes in the "Withdrawal Restrictions" section of the Application are checked off and it does not contain the initials of Mary Hess, as primary member, the Debtor, or his sister.

In two other sections of the Application, however, the signature of Mary Hess, as primary member, does appear. In the "Credit Check" section of the Application, Mary F. Hess signed this section authorizing the Creditor to investigate her credit history, employment, and income including obtaining any credit reports in connection with her application for membership or to update, renew, or for an extension of credit. In the "Checking Account Acknowledgment" section of the Application, Mary F. Hess signed as primary member to authorize Creditor "to establish a checking account for me/us" and "to pay items authorized by me (or any of us) and to charge all such payments against the money in this account." Under the "Checking Account Acknowledgment" section of the Application, are two multi-column boxes denoted as "Joint (1)" and "Joint (2)." Appearing in the "Joint (1)" box are details about the Debtor's sister, Gail Hess, along with her signature. Pertinent details about the Debtor as well as his signature appears in the "Joint (2)" box .

Another, and separate, "Membership and Ownership Acknowledgment" section of the Application contains a paragraph in small print, which states:

> I/we submit this form to [Creditor] for two purposes. First, the individual listed as primary member (unless already a member) applies for membership in the credit union. Second, I/we request the credit union to open a share/deposit account in the member name(s) listed on this application. If more than one owner name is listed, the account shall be a multiple name share/deposit and the multiple account provisions of this agreement shall be applicable. If one or more beneficiaries are listed in the Beneficiary Information and Provisions section, the beneficiary provisions of this agreement shall be applicable. By signing below, the undersigned acknowledges that he/she is eligible for membership in the credit union and that he/she agrees to conform to the credit union's bylaws and any

3

amendments thereto. The undersigned acknowledges receipt of a Membership Account Agreement and agrees to be bound to the terms and conditions of any account that he/she has in the credit union now or in the future. If the type of account is a savings (share draft)/checking account, the undersigned acknowledges receipt of a copy of this institution's Member Funds Availability Policy and Electronic Fund Transfer Agreement. I/we understand I/we will be issued a Personal Identification Number (PIN) to be used for the credit union's Phone Account Access and Online Account Access. I understand that this PIN will be mailed to me, the primary member. I also accept responsibility for this PIN and whom I grant access to it. In order to open an account, add a signer or make a loan, Federal law now requires us to obtain and retain information for identity verification purposes.

The "Membership and Ownership Acknowledgment" section of the Application calls for the signature of the primary member, Mary Hess, but does not contain her signature. In addition, copies of the "Membership Account Agreement" or the "Member Funds Availability Policy and Electronic Fund Transfer" referred to in the "Membership and Ownership Acknowledgment" section of the Application were not admitted into evidence.

During the evidentiary hearing, the Debtor testified that both he and his wife had a Visa credit card account with the Creditor for several years before he completed and signed the Application in April 2005. He represented that he and his mother completed the Application while at the credit union but that his sister completed the Application at a later time at his mother's home. He testified that the purpose of the Application was to be able to use the funds in the account to pay his mother's expenses in the event she could not do so, explaining that at the time his father passed away there were complications with his accounts upon his death. He further testified that (a) his mother wanted to make sure there were no complications for her children if she was incapacitated or in the event of her death and (b) they explained to a Creditor's representative what they wanted to do and that she then provided them with the Application to complete. Debtor could not recall whether the account number was listed on the Application before he filled it out and admitted that he signed certain sections of the Application, he was not under duress at the time he signed the Application and was not forced to do so. The Debtor testified further that his understanding was that by completing and signing the "Multiple Name Share Deposit Account With Survivorship" section of the Application, a survivorship account was being created. He testified that he did not recall receiving any information about

4

the Account from Creditor, he never deposited or withdrew any funds from the Account, and he did not know that the Application provided him with the right to access all of his mother's accounts held with the Creditor. The Debtor explained that his mother had an existing account with the Creditor for many years and that all of the funds in her account at the time the Application was completed belonged solely to his mother and that his intent at the time he completed the Application was to be able to access his mother's account to pay her bills in the event she could not do so. He further testified that his knowledge of his mother's account was limited to the few times he helped his mother balance her statements at the end of the month when any of her health problems, like the time she took a bad fall, interfered with her ability to handle the task on her own.

Exhibit B is a copy of an Account Statement for the period August 1, 2010 to August 31, 2010, on which Mary F. Hess appears as the only individual name and address. A "Member Number" is listed as 1012460. Three separate accounts are then listed on the Account Statement as follows:

| | | |
|---|---|---|
| Savings Regular - xxx2460100 | ending balance: | $9,693.83 |
| Checking Regular - xxx24603 | ending balance: | $2,917.57 |
| Money Market - xxx2460101 | ending balance: | $5,694.96 |

Reviewing Exhibit B, the Debtor admitted that his name does not appear on the Account Statement and that he did not personally receive any account statements for any of the three accounts. Debtor testified that his intent was to sign a document for a checking account and that he never signed any applications for his mother's credit union account, money market account, or her savings account.

## Discussion

Section 553 of the Bankruptcy Code preserves the right to set off as a widely recognized common law right that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S. Ct. 286 (1995). Section 553 provides, in part:

> Except as otherwise provided in this section and in sections 362 and 362 of this
> title, this title does not affect any right of a creditor to offset a mutual debt owing

5

by such creditor to the debtor that arose before the commencement of the case
under this title against a claim of such creditor against the debtor that arose before
the commencement of this case[.]

"State law governs the substance of a set off claim under § 553." *In re New Haven Foundry, Inc.*, 285 B.R. 646, 648 (Bankr. E.D. Mich. 2002 (citation omitted). The right to set off is preserved where (1) there are mutual, pre-petition obligations owing between the debtor and the creditor and (2) a right to setoff the obligations exists under non-bankruptcy law. *In re Holder*, 182 B.R. 770, 775 (Bankr. M.D. Tenn. 1995).

The Creditor makes two arguments in support of its motion. First, Creditor relies on Mich. Comp. Laws § 490.361(4), which provides, in part,

> Except as provided in this subsection or where prohibited by applicable state or federal law or otherwise agreed by contract, a domestic credit union has a lien on any share of a member, or any deposit account from which a member may withdraw for his or her own benefit without the consent of another person, for any obligation owed to the domestic credit union by that member or for any loan cosigned or guaranteed by that member.

Thus by its express terms, Mich. Comp. Laws § 490.361(4) provides a credit union with a lien under two scenarios, both of which apply when a member is indebted to the credit union. In these situations, Mich. Comp. Laws § 490.361(4) provides a credit union with a lien (a) "on any share of a member" or (b) "any deposit account from which a member may withdraw for his or her own benefit without consent of the another person." The uncontroverted evidence indicates that the Debtor is not a member on any share or any deposit account with the Creditor. His mother, Mary Hess, however, was a member of the Creditor. Debtor testified that he did not apply for membership at the Credit Union at the time he completed the Application. On its face, the Application does not refer to the Debtor as a member or indicate that the Debtor was applying for membership with the Creditor. The Creditor did not introduce any evidence about the Debtor's membership status. In addition, the Visa credit card agreement between the Debtor and Creditor is not part of the record. Thus, this Court is unable to determine if the Debtor is a member of the Creditor by way of his Visa credit card account. Likewise, the Court is unable to draw any inference about the Debtor's membership status with the Creditor merely because he has a Visa credit card account with Creditor. Therefore, the Court finds that Creditor failed to

6

prove that Mich. Comp. Laws § 490.361(4) applies to the facts in this case.

For its second argument, the Creditor relies on Mich. Comp. Laws. § 490.64, which states:

> Without qualifying any other statutory right to set-off or lien and subject to any contractual provision, when a party to a multiple-party account is indebted to a credit union, the credit union has a right to set-off against the entire amount in the account.

Creditor argues that a multiple-party account between the Debtor, his sister, and his mother was established under the Application. As a result, the Creditor asserts that Mich. Comp. Laws § 490.64 provides it with a right to set-off the entire amount of the Account because the Debtor, as a party to a multiple-party account, is indebted to the Creditor on the Visa credit card account held by him and his wife.

The Debtor challenges this assertion on two grounds. First, the Debtor argues that mutual, pre-petition obligations do not exist between him and the Creditor. Debtor admits that he has a Visa credit card account with the Creditor but denies that he has an interest in the Account with his mother. Debtor argues that his mother did not agree to the terms or sign the "Membership and Ownership Acknowledgment" section of the Application, and therefore, a multiple-party account was not created under the Application so mutual pre-petition obligations do not exist to allow Creditor to reach the funds in the Account. Alternatively, the Debtor argues that if the Court determines that a multiple party account was created under the Application, such account should be limited to his mother's checking account with Creditor. Second, the Debtor asserts that Creditor's right to set off is presumed to exist under Mich. Comp. Laws § 490.64, but that such presumption may be rebutted under Mich. Comp. Laws § 490.58, which states in pertinent part:

> The presumptions stated herein are based upon inferences of the intention of the parties to multiple-party accounts arising from the form of the account and the usual expectations of people using these accounts. The presumptions are rebuttable by clear and convincing evidence of a different intention.

Debtor argues that Mich. Comp. Laws § 490.58 permits a party to "rebut the presumption that a multiple-party account was formed" and that clear and convincing evidence exists in the record to establish that there was no intention to create a multiple party account with the Creditor.

The central factor in the Debtor's first argument is whether a multiple-party account was created under the Application. The terms of the parties' contract – the Application – govern the Court's analysis. It is undisputed that Michigan law controls the resolution of this matter. The long-held rules of contract construction under Michigan law are as follows:

> Our Supreme Court's contract jurisprudence emphasizes the well-defined roles of courts in contract disputes: viz., *courts enforce unambiguous contract terms*. . . .We enforce contracts according to their terms, as a corollary of the parties' liberty of contracting. . . .We examine written contractual language, and give the words their plain and ordinary meanings. . . . An unambiguous contractual provision reflects the parties' intent as a matter of law, and "[i]f the language of the contract is unambiguous, we construe and enforce the contract as written. . . . Moreover, courts may not impose an ambiguity on clear contract language, . . . because Michigan courts honor parties' bargains and do not rewrite them. . . . For instance, courts generally may not attempt to evaluate whether a contract is one of "adhesion." . . . "An 'adhesion contract' is simply that: a *contract*. It must be enforced according to its plain terms unless one of the traditional contract defenses applies."
>
> On the other hand, a contract is ambiguous when two provisions "irreconcilably conflict with each other," or "when [a term] is equally susceptible to more than a single meaning[.] . . . Only when contractual language is ambiguous does its meaning become a question of fact. . . . The ancient common law rule of *conta proferentem* (an agreement is construed against its drafter) is used only when there is a true ambiguity, and the parties' intent cannot be discerned through all conventional means, including extrinsic evidence.

*Holland v. Trinity Health Care Corp.*, 287 Mich. App. 524, 526-27, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) (internal citations omitted) (emphasis in original).

The evidence shows that the Debtor's mother held a member account with the Creditor that encompassed separate checking, savings, and money market accounts. The uncontroverted evidence also establishes that these accounts were in her sole name at the time the Application was completed in April 2005. A review of the Application in its entirety reveals the lack of any explicit language shedding light on the Debtor's mother's intentions with regard to each of the accounts she held with the Creditor. Several sections of the Application are ambiguous as to her intent due to the use of check-off boxes, terms of art, imprecise language, and clumsily arranged provisions in the Application. The fact that at an "X" appears in the "Name change" and "Add or Change Joint or Beneficiary" boxes indicates an intent to add or change a name on an account.

8

Additional support for this interpretation exists by the fact that the Debtor's mother's member number is typed on the Application and pertinent contact information about the Debtor and his sister along with their signatures appear in both the "Multiple Name Share Deposit Account" and the "Checking Account Acknowledgment" sections of the Application. One possible interpretation is that these few provisions of the Application indicate an intention to change the Debtor's mother's member's account from being solely in her name to add the names of the Debtor and his sister to her member account.

      Consideration of other aspects of the Application, however, create an ambiguity as the Debtor's mother's intention. First, the Application does not contain any specific authorization by the Debtor's mother requesting the creation of a multiple party account for her member account. As pointed out by the Debtor, his mother's signature does not appear in the line provided in the "Membership and Ownership Acknowledgment" section of the Application. The plain language of this provision reveals that only one of the two purposes listed would have applied to the Debtor's mother's situation. The first purpose was applicable if a person was applying for membership with the Creditor. An express reference appears in this provision to state that the first purpose did not apply if a party to the Application was already a member of the Creditor. It is undisputed that the Debtor's mother was already a member of the Creditor prior to the completion of the Application. With regard to the second purpose, a signature on the line appearing in the "Membership and Ownership Acknowledgment" section, represented a request by the primary member for the "credit union to open a share/deposit account in the member name(s) listed on this application. If more than one owner name is listed, the account shall be a multiple name share/deposit and the multiple name account provisions of this agreement shall be applicable." (Ex. A). Yet, the Debtor's mother did not sign on the line provided to indicate that she authorized the Creditor to establish a share/deposit account for her, the Debtor, and his sister. The only name designated as a member throughout the Application is the Debtor's mother as a primary member. Although the Debtor's sister is designated as "Name (2)" and the Debtor is designated as "Name (3)" in the "Multiple Name Share Deposit Account with Survivorship" section of the Application, neither one of them is listed as being an owner or a member. Of course, a possible construction of the "Membership and Ownership Acknowledgment" section is that this section did not apply to the Debtor's mother's situation at

9

10-68235-wsd   Doc 25   Filed 08/23/11   Entered 08/24/11 07:05:36   Page 9 of 11

all because she already had an existing member share/deposit account with the Creditor.

The Court concludes that the plain reading of the language used in this provision indicates that the second purpose applied even if a party to the was already a member and had an existing account with the Creditor. If the Debtor's mother's signature had been placed in the "Membership and Ownership Acknowledgment" section, it would have manifested her acceptance to be bound by the terms and conditions of "any account that he/she has in the credit union now or in the future." As a result, the more reasonable construction of the language used in this provision, leads the Court to conclude that the Debtor's mother's signature was required to establish (1) a multiple party account; (2) to make the multiple name account provision applicable; (3) to accept the Creditor's by-laws; (4) to accept the terms and conditions of a "Membership Account Agreement" along with a "Member Funds Availability Policy and Electronic Fund Transfer Agreement."

In direct contrast, and unlike the "Membership and Ownership Acknowledgment"section of the Application, the "Checking Account Acknowledgment" section clearly expresses the Debtor's mother's intention. Her signature appears in the line provided and by her signature she authorized the Creditor (a) "to establish this checking account for her/us" and (b) "to pay items authorized by me (or any of us) and to charge all such payments against the money in this account." Appearing immediately after the Debtor's mother's signature are the names of the Debtor and his sister along with their personal information and their signatures in the boxes entitled "Joint (1)" and "Joint (2)." A natural reading of the "Checking Account Acknowledgment" section as a whole evidences the Debtor's mother's intention to change her checking account from being solely in her name to add the names of the Debtor and his sister to her checking account and to provide them with the power to make payments from her checking account. Consequently, the language used in the "Checking Account Acknowledgment" section indicates that the Debtor would be a party to an account with his mother, which, in turn, would make the checking account fit the statutory definition of a multiple party account. See Mich. Comp. Laws § 490.51(d) (defining a "multiple-party account" as "an account in the names of 2 or more persons, 1 or more or all of whom may make withdrawals, . . . . At least 1 party to a multiple-party account shall be a member of the credit union in which the account is established"). The Debtor's unrefuted testimony supports and strengthens the Court's

10

interpretation of this provision. The Debtor testified that the intention was for him and his sister to be added to his mother's checking account to enable them to assist her with her finances in the event she was unable to do so. While the Debtor also testified about the intention to create an account with joint survivorship, the Application is devoid of any language to establish that the Debtor's mother intended for the Debtor and his sister to be added to and have a right of survivorship in all of her accounts with the Creditor. Even if this was the Debtor's mother's intention, her failure to sign the "Membership and Ownership Acknowledgment" section of the Application prevented her intention from being accomplished.

In light of the Court's determination that the only multiple-party account established under the Application was limited to the Debtor's mother's checking account, it is not necessary for the Court to address the Debtor's second argument about the presumptions that exist under Mich. Comp. Laws § 490.52 to § 490.58.

## Conclusion

For the indicated reasons, the Court grants the Creditor's motion for relief from the automatic stay to allow it to exercise its set-off rights under Michigan law, but limited to the only multiple party account established under the Application, which is the checking account having the last five numbers of xxx24603. Debtor shall present an appropriate order.

**Signed on August 23, 2011**

                                            **/s/ Walter Shapero**
                                 **Walter Shapero**
                                 **United States Bankruptcy Judge**